UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | ) ) ) | No. 6:18-CV-298-REW |
| Plaintiff, | ) ) | |
| v. | ) ) | OPINION & ORDER |
| VELVA DELPH, et al., | ) ) | |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The remaining parties in this interpleader case assert competing claims to decedent William Brent Bundy's life insurance proceeds, payable under a group policy that former Plaintiff Prudential issued through the decedent's employer. Defendants Velva Delph and Willie Bundy, parents of the deceased, seek summary judgment; they contend that the designation of competing claimant Defendant Sarah Carta (the decedent's live-in girlfriend at the time of his death) as beneficiary was fraudulent and, thus, that they are entitled to the funds per the policy's default beneficiary terms. However, disputed fact questions underly movants' theories of designation invalidity. Summary judgment is thus inapt on this contested record.

## 1. Factual and Procedural Background

William Brent Bundy ("Brent") died on September 8, 2018 from a gunshot wound to the forehead. The Madison County Coroner ruled the death a suicide. DE #1-2 at 74

1

(Death Certificate).[1] Brent's parents, Delph and Bundy, were appointed co-administrators of his estate. DE #30-2 ¶ 3 (Delph Declaration). At the time of his death, Brent worked as a fork-truck driver for Sherwin-Williams in Richmond, Kentucky; he had life insurance coverage, issued by Prudential, through his employer. *See* DE #1-2 (Group Life Insurance Policy). Brent began dating Carta in January 2017, while she was separated (though not yet divorced) from her husband. DE #39-1 (Carta Dep. at 15);[2] *see also* DE #30-6 (Carta Divorce Decree, dated August 15, 2018). Brent was divorced at the time, with no children. DE #30-2 ¶ 2 (Delph Declaration). Carta and Brent began living together, with Carta's four minor children, sometime before September 2017. DE #39-1 at 6–7. The couple comingled their finances, to a degree; Carta and Brent had a joint checking account, and each had his or her own, separate account, all at Chase Bank. *Id.* at 43. They further shared the account access information for their individual accounts with one another. *Id.* at 47.[3]

On November 13, 2017, several changes were made to Brent's life insurance policy selections during his employer's open enrollment period, via the online portal. DE #39-1

---

[1] Though Delph and Bundy speculate as to correctness of the suicide determination, they expressly decline to raise Brent's cause of death as an issue in this action. *See* DE #35 at 1 n.1. The Court presumes it a suicide, consistent with the coroner's characterization.

[2] Deposition citations refer to the CM/ECF pagination.

[3] Carta admitted in her deposition that she was struggling financially at the time and filed for bankruptcy in December 2017. DE #39-1 at 6; *see also* DE #7 (Chapter 7 Bankruptcy Petition). Delph and Bundy emphasize Carta's failure to disclose certain assets—namely, a GMC Yukon titled to Brent, but (per Carta) paid for by Carta and her ex-husband—in the bankruptcy case. However, to the extent the alleged nondisclosure bears on Carta's honesty or credibility, it is not pertinent to the summary judgment inquiry. The Court must view the facts and make reasonable inferences in the light most favorable to non-movant Carta, avoiding credibility assessment at this stage. To the extent Delph and Bundy cite Carta's financial instability as a suggested motive for her allegedly fraudulent self-designation, it simply highlights the vigorously disputed question of whether Carta acted independently and covertly, or at Brent's express direction, when she made the beneficiary selections.

at 50–51. Someone, on Brent's account, purchased three life insurance policies: Optional Life Insurance in the amount of $46,000, Basic Life Insurance in the amount of $91,000, and Optional Accidental Death & Dismemberment Insurance in the amount of $400,000. DE #30-4 (November 2017 Benefits Summary). Each policy listed Carta as the sole beneficiary. *See* DE #30-15 (Beneficiary Confirmation Notice, dated November 14, 2017). Absent any specific beneficiary designation, the proceeds would have been payable to Brent's parents, per the default policy terms. DE #1-2 at 54.[4] Carta testified that she made the life insurance (as well as other health insurance) benefit selections from a laptop at the home she and Brent shared, at Brent's request, and that the two were texting about the choices throughout the process because Brent was then at work. DE #39-1 at 55–56. She further testified that she and Brent also may have discussed the choices a few days before making the online changes, and that Brent had come home for lunch on November 13, just before the benefits enrollment. *Id.* at 56–59. Carta is unable to retrieve the text messages that she and Brent exchanged during the November 2017 selections process. *See id.* at 59–62.

Carta did, however, produce text messages between the pair, from April 2017, that discussed beneficiary designation. DE #40-1.[5] On April 3, 2017, Brent expressly advised

---

[4] The relevant policy section provides: "If there is a Beneficiary for the insurance under a Coverage, it is payable to that Beneficiary. Any amount of insurance under a Coverage for which there is no Beneficiary at your death will be payable to the first of the following: your (a) surviving Spouse or Domestic Partner; (b) surviving child(ren) in equal shares; (c) surviving parents in equal shares; (d) surviving siblings in equal shares; (e) estate." *Id.* As Brent had no spouse or children at the time of his death, his parents would have been the default recipients. Per Prudential (as advised by Sherwin-Williams), there was no beneficiary on file prior to 2017. DE #1 ¶ 17.

[5] Defendants Delph and Bundy supplied the text messages, as provided by Carta in discovery. *See* DE #40 at 1. No party has challenged the text messages' authenticity. Carta confirmed in her deposition production of the April 2017 text messages between Brent and

Carta that he would be designating her as his life insurance, pension, and 401(k) beneficiary. He texted Carta: "I'm signing u as my beneficiary for my life insurance. My 401 k and my pension. I want you and kids to have it. I'm not waiting till u marry me to do it cause if something happens to me before then it won't be set don't argue with me on it if u do I'll have it willed to all 4 kids." DE #40-1 at 24. Though Carta responded that Brent did not "have to do that," Brent insisted there would be "[n]o negotiation" on the subject. *Id.* Brent proceeded to further explain and justify his decision. *See id.* at 29 ("It's just what I want to do with it and that's what I'm doing I will not take any other suggestions."); *id.* at 30 ("I see it like this. I'm the one working for it so it's mine to do with as I please. I love you and those kids. I'll never and wouldn't ever love another woman the way I love you. So I'm giving it to the people I love. My mom don't need my money my brother is almost a millionaire my sister doesn't hurt for money so I don't wanna hear you say give it to one of them."); *id.* at 32 ("I'm not working my ass of here paying into 401k. Having them give me a pension if I can't give it to the love of my life and those kids. So if I die tonight. It's yours."). The April 3 conversation concerning benefits concluded with Carta insisting that Brent had promised not to leave her, "even in death[,]" and urging him not even to "say it[.]" *Id.* at 33.

Carta and Brent discussed the life insurance topic again a week later. *See* DE #40-2 (April 10, 2017 text messages). Brent again broached the subject, saying: "How much I'm worth dead. 698 thousand. 6 dollars 98 cents alive." *Id.* at 14. Carta seemed surprised at Brent's statements, asking him, "Why would u look that up[?]" *Id.* Brent responded:

---

herself. *See* DE #39-1 at 57–62. Carta's testimony sufficiently supports authenticity of the message screen captures.

"Remember the other day when I put u down as [beneficiary] I said I wanted to look up how much life insurance I had[.]" *Id.* Brent persisted on the topic: "I wanna make you a promise . . . [I don't] know why this is on my mind today. But I think it's cause we talked about money." Though Carta thought Brent was referring to an earlier discussion between them about starting a savings account, Brent clarified that he was thinking about his "life insurance and 401k." *Id.* at 21. He then informed Carta that, even if she left him at that moment, he would maintain her designation as beneficiary. *Id.* at 22 ("First off this would devastate me. But if you looked at me today and told me u couldn't stand me. Ur still gonna be the [beneficiary] to that. Cause I couldn't stand to think you would have to worry over money ever[.]"). Carta assured Brent that she "would never do that[,]" and Brent responded that, if she did, he would "step off [a] mountain[.]" *Id.* The discussion ended with Brent explaining that he "just want[ed] to know [that Carta was] taken care of[,]" and Carta asking that Brent "[s]top thinking about that[.]" *Id.* at 23. The April discussions preceded the benefit changes by 6+ months. Brent's death occurred the following September.

On September 14, 2018, seven days after Brent's death, Bundy sent a letter directed to the "Sherwin-Williams Benefits Department[,]" inquiring about Brent's life insurance proceeds and "questioning the legitimacy" of Carta's designation as beneficiary. DE #1-2 at 82 (Bundy Letter). Delph sent a similar letter on September 20, noting that she "would like to file an objection on the life insurance beneficiary for [her] son, contesting the on-line changes" made in November 2017. *Id.* at 84 (Delph Letter). Sherwin-Williams confirmed internally that Carta was in fact the nominal beneficiary on all three life insurance policies. *Id.* at 76. However, given the competing claims and Delph's representations, the company initiated a fraud investigation concerning the beneficiary

5

change. DE #30-12. The fraud investigation revealed that the beneficiary change was made on Brent's account while he was at work; Sherwin-Williams, through its Director of Health and Welfare Plans, Martha Lanning, confirmed that two benefits system access points occurred on November 13, 2017 (at 1:08 p.m. and 1:26 p.m. Eastern Time) from an iPad, and that Brent was paid for eight hours of work on that date.[6] DE #30-11 (Lanning Dep.) at 6–9. Lanning further noted that Brent had never purchased optional life insurance coverage before November 2017. *Id.* at 8.

On September 27, 2018, Carta submitted a Group Life Insurance Claim. DE #1-2 at 88–91. The following day, Carta wrote a letter to Prudential, advising that she was Brent's sole beneficiary and inquiring about an assignment for Brent's funeral payment. DE #39-8 (September 2018 Carta Letter). On October 22, 2018, Delph's counsel submitted a letter to Prudential, reiterating Delph's continued claim to the insurance proceeds and encouraging Prudential to file an interpleader action to resolve the apparent dispute. DE #1-2 at 93–101. Delph's letter accused Carta of fraudulently designating herself as the beneficiary; Delph further characterized Carta as having a "purely financial interest" in Brent and expressed suspicion about Carta's involvement in Brent's death. *Id.* After the funeral, on November 6, 2018, Carta again wrote to Prudential, providing a "statement" concerning her perceived right to the insurance proceeds. DE #39-9 (November 2018 Carta Letter). In the letter, Carta accused Delph of "telling both companies [Sherwin-Williams and Prudential] anything she can in order to delay the proceeds or mislead them to cause

---

[6] The fraud investigation also revealed two access instances on November 1, 2017 (at 9:30 and 10:39 a.m.), when Brent (or someone using his account credentials) added an email address and changed his password, though no actual benefits selections occurred until November 13. DE #30-12 at 4. Per Lanning, Brent also worked a full day on November 1. DE #30-11 (Lanning Dep.) at 9.

doubts in distributing the proceeds to the rightful beneficiary." *Id.* at 1. She further described several negative (largely asset- and finance-related) interactions with Delph following the funeral, and she stated her belief that Brent designated her as his beneficiary in February or March of 2017. *See id.* at 6 ("To the best of my knowledge, he made me his beneficiary around February/March of 2017 or at least that is what he came home from work and told me.").

Carta also referenced a recent conversation with police about the circumstances of Brent's death. Per Detective Allen's resulting report, Delph and Bundy had approached the police on September 19, 2018, to express suspicion of Carta and the role they believed she played in Brent's death; Delph and Bundy advised the police that Carta appeared preoccupied with the insurance proceeds. DE #30-10 (Detective Allen Report).[7] Detective Allen spoke with Carta the following day. *Id.* Carta admitted that, following Brent's death, she had transferred money from Brent's individual account into their joint account to pay for funeral and household expenses.[8] *Id.* She further stated that "she ha[d] not put anything in place to gain financially with [Brent's] death[,]" and "[a]ny steps that were done to make

---

[7] Delph's and Bundy's allegation that Carta was fixated on the life insurance proceeds sharply contrasts with Carta's November 6 letter to Prudential, which alleged Delph's preoccupation with financial matters following Brent's death, including her insistence on taking possession of various vehicles that Brent owned (in title, at least). In response, Carta filed a complaint in the Madison Circuit Court for the vehicles. DE #30-17.

[8] Though Carta agreed to pay for Brent's funeral in the event the insurance proceeds would not do so, she ultimately did not foot the bill, as the life insurance proceeds covered all expenses. *See id.*; *see also* DE #20 (Request for Release of Funeral Expenses); DE #39-6 (Statement of Britton Funeral Home, dated September 28, 2018, confirming that the funeral home mailed Carta's voided check back to her after receiving payment verification from Prudential). However, troublingly, Carta did file a proof of claim against Brent's estate on October 15, 2018, for funeral expenses. *See* DE #30-19.

her an insurance beneficiary [were] done by [Brent]." *Id.*[9] Ultimately, Detective Allen

noted that, per the County Attorney, the state would pursue no criminal charges related to

Brent's death, and it believed that the extant financial matters were best suited for probate

resolution. *Id.*

Prudential filed this interpleader action in November 2018. DE #1 (Complaint). In

July 2019, the parties consented to Prudential's dismissal from the case, after it deposited

the contested insurance proceeds with the Court. DE #28 (Consent Order). Prudential

deposited a total of $139,934.75, comprising the owed benefits (less funeral costs), plus

applicable interest.[10] DE #29 (Receipt). Delph and Bundy jointly moved for summary

judgment in December 2019. DE #30. Carta opposes summary judgment (DE #36), and

movants have replied (DE #37).[11] The matter is ripe for review.

### 2. ERISA Framework

This Court has "subject matter jurisdiction over an interpleader action initiated to

determine the proper beneficiary of an employee pension benefit plan." *IBEW Pac. Coast

Pension Fund v. Lee*, 462 F. App'x 546, 548 (6th Cir. 2012) (citing 29 U.S.C.

§ 1132(a)(3)(B)(ii)). The Employee Retirement Income Security Act of 1974, 29 U.S.C.

§ 1001 *et seq.*, (ERISA) governs the at-issue life insurance plan. As a general matter,

---

[9] In her deposition, Carta attributed her change in position—namely, her admission that she had made the beneficiary selections at Brent's direction, in contrast with her 2018 representations to Detective Allen and Prudential—to greater recollection following sufficient "time to grieve." DE #39-1 at 58.

[10] Lanning recalled that the parties made claims on Brent's Basic ($46,000) and Optional ($91,000) coverage plans, but could not recall whether they ever made any claims on the $400,000 Accidental Death and Dismemberment policy. DE #30-11 at 8.

[11] Movants' filing of a condensed brief, at the Court's direction, and Carta's delayed response produced a somewhat extended briefing timeline. *See* DE #34 (Order); DE #35 (Condensed Memorandum in Support of DE #30).

"claims touching on the designation of a beneficiary of an ERISA-governed plan fall under ERISA's broad preemptive reach and are consequently governed by federal law." *Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000) (concluding that claims contesting beneficiary designation validity, under theories of forgery and undue influence, were preempted by ERISA); *see also McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir.), *on reh'g*, 922 F.2d 841 (6th Cir. 1990) ("The designation of beneficiaries plainly relates to these ERISA plans, and we see no reason to apply state law on this issue."). "The court must therefore look to either the statutory language or, finding no answer there, to federal common law which, if not clear, may draw guidance from analogous state law." *McMillan*, 913 F.2d at 311.

ERISA requires a plan administrator (here, Prudential) to determine the appropriate beneficiary strictly "in accordance with the documents and instruments governing the plan[.]" 29 U.S.C. § 1104(a)(1)(D). Ordinarily, the plan documents designating a particular individual as beneficiary would thus control. *See Metro. Life Ins. Co. v. Pressley*, 82 F.3d 126, 130 (6th Cir. 1996). However, the rule that "courts need not look beyond the beneficiary designation form to determine the appropriate beneficiary" is inapplicable "where the validity of a plan document itself is in question." *Tinsley*, 227 F.3d at 704. The Court first looks to the statute for direction. But because "ERISA does not contain any provisions regulating the problem of beneficiary designations that are forged, the result of undue influence, or otherwise improperly procured," federal common law governs. *Id.* Where "there is no established federal common law in this circuit dealing with" the applicable challenges to a beneficiary designation, the Court "look[s] to state-law

principles for guidance." *Id.*[12] In the summary judgment posture, the typical Rule 56

burdens and standards apply in an ERISA case of this nature. *See, e.g.*, *Tinsley*, 227 F.3d

at 703; *Metro. Life Ins. Co. v. McGhee*, No. 15-2467-STA-DKV, 2016 WL 2742429, at *8

(W.D. Tenn. May 10, 2016).[13]

---

[12] In a case where the plan permits the administrator discretion to determine benefits eligibility per the plan documents' terms, "a court reviews the administrator's decision on the eligibility of benefits under the 'arbitrary and capricious' standard." *Daft v. Advest, Inc.*, 658 F.3d 583, 594 (6th Cir. 2011). The plan documents in this case afford Prudential such discretion. *See* DE #1-2 at 68 ("The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious."). "However, this deferential standard does not apply to a plan administrator's determination of questions of law[.]" *Daft*, 658 F.3d at 594. Claims other than those for denial of benefits "are therefore addressed in the first instance in the district court, requiring no deference to any administrator's action or decision." *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 427 (6th Cir. 2006). Prudential has neither awarded nor denied any benefit claims in this case; therefore, no deferential standard applies. Nor is the Court limited to consideration of any "administrative record," which is, essentially, nonexistent in this case, given Prudential's lack of decision on the competing claims and the subsequent interpleader filing. *See Humana Ins. Co. of Kentucky v. O'Neal*, 727 F. App'x 151, 156 (6th Cir. 2018) ("When interpleader is properly invoked, as it is here, the court determines the respective rights of the claimants to the fund or property at stake through the normal litigation processes, including pleading, discovery, motions, and trial."); *see id.* at 155 ("Humana did not deny O'Neal's claim for benefits so this is not a typical ERISA benefits action. Humana took no position on the outcome as between O'Neal and Perkins and placed the benefit amount in the district court registry. There is no 'administrative record,' although Humana communicated with both O'Neal and Perkins before filing the interpleader action."). As in *O'Neal*, the Court simply considers the communications between Prudential and the claimants as part of the full record, along with the depositions and other appropriate evidence proffered.

[13] The *Tinsley* Court noted the district court's conclusion "that Tinsley had the burden of proving that Williams's decision to change the beneficiary of his life insurance plan was affected by undue influence exerted by Calloway[.]" 227 F.3d at 703. The Court expressed no disagreement with this burden allocation. It also, consistent with Rule 56, found the summary judgment movant (Calloway, the claimant competing with Tinsley, who sought to demonstrate that the designation was valid) responsible for demonstrating the absence of any genuine issues of material fact. In contrast with the *Tinsley* posture, the movants here are the parties claiming designation *invalidity*. Nonetheless, the burdens fall as they did in *Tinsley*—Delph and Bundy ultimately must prove that the designation was invalid, and they here must show, to warrant summary judgment, that there are no fact issues

### 3. Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Courts may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986). "The relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson*, 106 S. Ct. at 2512).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce

---

surrounding the beneficiary designation and that it was invalid as a matter of law. *See also Metro. Life Ins. Co. v. Thomas*, No. 1:10-CV-00290, 2011 WL 2470001, at *2 (W.D. Mich. June 20, 2011) ("Christine Thomas bears the burden of proof of her assertion that the June 28, 2008, beneficiary designation of Ronald Richey is a forgery.").

"specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

### 4. Analysis

Movants make two overarching arguments. First, they contend that Carta's designation as beneficiary was *per se* invalid, per the plan's terms, because the insurance plan required Brent himself to designate any beneficiary; they further argue that—as, per the same theory, Brent personally took no affirmative steps to designate a beneficiary—he did not even substantially comply with the plan's terms.[14] Second, Delph and Bundy argue that, under Kentucky law, Carta's conduct constituted forgery and insurance fraud,[15] rendering the beneficiary designation invalid. The Court discusses each theory in turn.

#### A.  *Carta's Agency and Brent's Compliance with the Plan*

As movants note, the plan states: "You have the right to choose a Beneficiary for each Coverage under this Prudential Group Contract." DE #1-2 at 54. Delph and Bundy emphasize the "you" in reference to the covered employee, maintaining that it requires the employee himself to physically make the online selections. The plan language, though, offers no further detail. Carta's theory is that she acted at Brent's direction, with his express permission and authority to make the changes. Though ERISA governs the plan itself, the statute has no provision explicitly "addressing whether an insured has effectively changed a beneficiary designation." *Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 564 (7th Cir. 2002) (citing *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 559 (4th Cir. 1994)). Neither the plan documents, nor ERISA, governs whether agency principles bind Brent to the November 2017 beneficiary designation. Federal common law thus applies. *Cf.*

---

[14] Though Delph and Bundy structure this argument in two distinct parts, they are intimately tied and the Court considers them in conjunction.

[15] Though Delph and Bundy reference undue influence and discuss cases arising in such a context, they do not actually develop any undue influence argument in relation to the facts of this case.

*Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 150 F.3d 590, 593 (6th Cir. 1998) (concluding that the Court was properly "guided by the law of agency as developed and interpreted as a matter of federal common law" in determining whether apparent authority bound a union to certain modifications of an ERISA-governed retirement plan).

State law agency principles from within this Circuit offer useful guidance and signify a consistent approach. Courts agree that implied authority—functionally, actual authority—exists where the circumstances demonstrate that the principal intended the agent's conduct to bind him in carrying out a delegated duty. *See, e.g.*, *Mill St. Church of Christ v. Hogan*, 785 S.W.2d 263, 267 (Ky. Ct. App. 1990) ("Implied authority is actual authority circumstantially proven which the principal actually intended the agent to possess and includes such powers as are practically necessary to carry out the duties actually delegated."); *Lacy v. Hodgkin*, 122 S.W.2d 768, 771 (1938) (recognizing that "that agency may be proved by circumstantial evidence and may be implied from the acts and conduct of the parties"); *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 568 (6th Cir. 2006) (citing *Natl. City Bank v. Rhoades*, 779 N.E.2d 799, 804 (Ohio Ct. App. 2002)) ("Actual authority is the authority that the principal intentionally grants to an agent."); *Bergin Fin., Inc. v. First Am. Title Co.*, 397 F. App'x 119, 124 (6th Cir. 2010) (quoting *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992)) (noting that implied authority is a form of actual authority under Michigan law); *Meretta*, 491 N.W.2d at 280 ("An agency relationship may arise when there is a manifestation by the principal that the agent may act on his account."); *see also Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 373 (6th Cir. 2015) (quoting *Restatement (Third) of Agency* § 2.01) ("[A]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably

believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.").

There is sufficient circumstantial and direct evidence to create a fact question as to whether Carta acted with Brent's authority when she made the November 13, 2017 beneficiary selections. Carta testified that she and Brent were in communication throughout the process,[16] and that Brent was directly guiding her conduct. Further, the April 2017 text messages provide background information about the couple's relationship, illustrating Brent's intent to make her the beneficiary and supporting Carta's position; clearly, at least at that point, Brent unequivocally declared that he intended Carta to be (and, as he noted, forever remain) the recipient of any pension, 401(k), and life insurance policy proceeds. He raised the topic, without prompting, both on April 3 and again on April 10, in each instance confirming his desire that Carta be the designated beneficiary. Finally, it is undisputed that the benefits selection confirmation letter (DE #30-15) was mailed to the home that Carta and Brent shared in November 2017. Though Delph and Bundy insist that Carta could have prevented Brent from viewing the letter, that mere inference is not clear from the record; nor is it undisputed. It is certainly conceivable that Brent indeed received the letter—delivered to his own home—and was unsurprised about the beneficiary changes because of his direct involvement in the process through Carta. Further, Brent's pay would have dropped because of the elections, meaning that for several months, he would have seen a smaller paycheck. Again, this could either have alerted him to a discrepancy or could have confirmed the elections he directed. These facts favorable to Carta (including her

---

[16] The Court defers potential evidentiary considerations and limitations regarding proof of Brent's statements. No party has yet broached the topic.

account of the November 13, 2017 events), if true, would permit a reasonable factfinder to conclude that Carta acted with Brent's actual authority in making the November 13, 2017 insurance changes, per relevant agency principles. *See Trustees of Plasters Local 67 Pension Tr. Fund v. Martin McMahon Plastering, Inc.*, 844 F. Supp. 2d 843, 851 (E.D. Mich. 2012) (citing *Cent. States Se. & Sw. Areas Pension Fund v. Kraftco*, Inc., 799 F.2d 1098, 1112–13 (6th Cir. 1986)) (observing "that the nature and scope of an agent's authority generally are questions of fact"). As an agency theory is a viable legal avenue to designation validity, and that here rests on disputed material facts, summary judgment is inapt.[17]

Accepting that Carta acted properly with Brent's actual authority in this context, as a reasonable factfinder could conclude, movants' substantial compliance theory would fail. Such a theory necessarily rests on Carta's inability, under the plan terms, to validly effectuate the beneficiary designation. Delph and Bundy characterize Carta's participation as an inherent deviation from the plan's designation requirements; they thus argue that,

---

[17] In refuting Carta's agency theory, Delph and Bundy rely on *Transamerica Life Ins. Co. v. Quarm*, No. EP-16-CV-295-KC, 2017 WL 5476471, at *6 (W.D. Tex. Nov. 13, 2017), for the proposition that even a power of attorney does not permit an agent to designate himself or herself a life insurance beneficiary on the principal's policy. DE #37 at 4. However, in reaching that conclusion, *Quarm* relied on applicable provisions of the Texas Estates Code. *See id.* ("That statute is explicit about the extent to which an attorney in fact may change the beneficiary of a life insurance policy."). The dispositive Texas provision in *Quarm* is inapplicable in this case. Further, in the context of analyzing an agent's self-designation as the beneficiary of the principal's annuity contract—a situation not covered by the Texas Estates Code—the court found the designation proper, and the transaction fair, so long as the principal consented to it. *See id.* at *3 ("One way to establish decisively that a transaction was fair to the principal is to show that the principal consented to it."). *Quarm* does not dictate the outcome in this case. Nor, to the extent Delph and Bundy so argue, does the lack of a recorded power of attorney resolve the agency question. *See, e.g.*, *Bergin Fin., Inc.*, 397 F. App'x at 124 (discussing whether an agent had actual authority even without any executed power of attorney); *Keating*, 615 F. App'x at 373 (same).

because Brent simply could have made the selections personally (in compliance with the plan's terms) when he returned from work, he did not fairly endeavor to comport with the plan's designation procedure. Under Sixth Circuit law, "'substantial compliance' requires that the insured do 'all that he reasonably could do to meet the conditions of the policy.'" *Life Ins. Co. of N. Am. v. Leeson*, 81 F. App'x 521, 524 (6th Cir. 2003) (quoting *Magruder v. Northwestern Mutual Life Ins.*, 512 F.2d 507, 509 (6th Cir. 1975)). As noted, the facts, viewed in the light most favorable to Carta, could support the existence of an agency relationship between Carta and Brent; critically, under such circumstances, there would be no question of substantial compliance, as Brent, as principal, would have *fully* complied with the plan's directives.[18] Because genuine fact issues exist surrounding Brent's intent and Carta's authority to act on his behalf, Carta need not also demonstrate that her designation on Brent's behalf, *if unauthorized*, would substantially comply with the plan's terms in order to avoid summary judgment. There simply is no need to consult the substantial compliance doctrine under these circumstances. An unauthorized change obviously would not be valid; an authorized change would comport with the plan. Movants cite to no case (or relevant plan language) that would preclude a participant from validly directing another person to effectuate a portal-based benefit change.

---

[18] Delph and Bundy do not challenge Brent's compliance with the remaining beneficiary designation requirements outlined in the plan, such as the requirement that "[t]he Beneficiary change form must be filed through the Contract Holder[,]" *i.e.*, through Sherwin-Williams. It appears undisputed that online selections made during open enrollment comply, as a general matter, with the plan's terms; the only disagreement is as to whether Carta validly effectuated those selections on Brent's behalf.

### B. Forgery and Insurance Fraud

The gist of movants' second argument is that under federal common law principles, as informed by Kentucky law, Carta's conduct amounted to forgery and fraud, necessarily rendering the beneficiary designation illegitimate. Delph and Bundy particularly rely upon a portion of Kentucky's criminal forgery statute:

> To "falsely complete" a written instrument means to transform, by adding, inserting or changing matter, an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it, so that the complete instrument appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker or drawer[.]

KRS § 516.010(6). Movants further assert that Carta's actions amount to a "fraudulent insurance act" under KRS § 304.47-020(1)(a)(1) because she "knowingly made false statements to Prudential, with the intent to deceive Prudential into paying her [Brent's] benefits." DE #35 at 17–18. It is true that Kentucky law guides the analysis in this context, as neither ERISA nor federal common law expressly governs forged (or fraudulent) beneficiary designations. *See Tinsley*, 227 F.3d at 704 ("[B]ecause there is no established federal common law in this circuit dealing with forgery . . . designation of beneficiaries, we look to state-law principles for guidance.").

The cited Kentucky statutes, though—to the extent they are even instructive as to the broader common law approach[19]—offer little assistance at the summary judgment stage; movants' arguments expressly turn on disputed interpretations of events and contested questions of credibility and intent. For example, Delph and Bundy centrally

---

[19] *Cf. Woolf v. Wigginton*, 659 F. App'x 526, 528 (10th Cir. 2016) (concluding that the Utah statute criminalizing forgery did not create any private cause of action permitting a claimant to challenge a life insurance beneficiary designation under an ERISA-governed plan). Here, Kentucky law is informative on but not equivalent to federal common law.

contend that "Ms. Carta deceptively effectuated the beneficiary designation herself" and "did so with the intent to deceive Prudential into paying Mr. Bundy's insurance proceeds to her[.]" DE #35 at 17. In support, movants emphasize Carta's admission that Brent was at work at the time of the selections changes, and that she operated the computer herself—they ignore, however, Carta's argument, supported in the record, that she did so at the express direction of and while in communication with Brent. As discussed, Carta's version has some evidentiary support. The Court cannot discount it in favor of movants' preferred inferences, at this stage. Similarly, Delph and Bundy ask the Court to discredit Carta's testimony concerning why she and Brent selected the $46,000 optional amount (per Carta, because Brent did not want to undergo a physical examination, *see* DE #39-1 at 84–85) and, instead, adopt their urged inference that "she bought as much insurance as she could, without having to inform Mr. Bundy what she was doing." DE #35 at 19. Rule 56 does not pick the winner from competing inferences.

Lastly, movants rely on the inconsistencies between Carta's representations to Detective Allen and Prudential, indicating that she played no role in the beneficiary designation process, and her contrary deposition testimony. Perhaps, as Delph and Bundy argue, these discrepancies suggest that Carta was lying to Detective Allen and Prudential and, once she received the fraud investigation findings showing that the beneficiary changes were made while Brent was at work, was forced to change her story. And, perhaps Carta in fact acted independently—and deceptively—on November 13, 2017 when she added herself as a beneficiary. But the record is in sharp conflict on this point. Just as some proof supports Delph's and Bundy's factual inferences, other evidence aligns with Carta's, namely the April 2017 text messages that are consistent with her representations as to the

19

November 2017 events. The Court reiterates that, at this stage, it must view the facts—at least, to the extent they have adequate evidentiary support, as here—in the light most favorable to nonmovant Carta and draw all reasonable inferences in her favor. The Court likewise must avoid evidence weighing and credibility assessment. Delph's and Bundy's arguments thus fall short of establishing the absence of any genuine factual issues underlying their forgery and fraud claims.

The Court understands the pervasive mistrust and doubt between the parties. The person that really knows is lost, leaving the survivors to quarrel over Brent's knowledge and intentions. Carta's motives and actions, viewed by Brent's parents, suggest greed and deception, but that is one interpretive side. Carta faces some honesty and incentive challenges, but the factfinder will have to sort the proof and make the credibility calls that do not properly occur within the Rule 56 rubric.

The Court thus denies the summary judgment request and will reset the matter for trial.

### 5. Conclusion

Accordingly, the Court **DENIES** DE #30 and **DIRECTS** the parties each[20] to file a status report, **within thirty days**, addressing the following topics:

1.  Trial readiness (*i.e.*, the anticipated amount of time needed for pretrial preparation);

2.  Estimated trial length;

3.  Any periods of likely unavailability in the remainder of 2020;

4.  Any other matters relevant to pretrial and trial scheduling; and

5.  Interest in mediation or a court-conducted settlement conference.

---

[20] Delph and Bundy may, of course, file a joint report.

This the 4th day of June, 2020.

Signed By:

_Robert E. Wier_

**United States District Judge**